UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ADAM WESTPHAL,<br><br>Defendant. | 3:18-CR-30099-RAL<br><br><br>ORDER ADOPTING REPORT AND RECOMMENDATION IN PART AND DENYING MOTION TO SUPPRESS |

On February 27, 2019, Adam Westphal (Westphal) filed an objection to Magistrate Judge

Mark A. Moreno's Report and Recommendation on Westphal's Motion to Suppress. Doc. 53.

Because the inevitable discovery doctrine applies to the firearms and methamphetamine seized and

the good-faith exception to the warrant requirement applies to the rest of the evidence seized, this

Court adopts Judge Moreno's Recommendation in part and denies Westphal's motion to suppress.

I.    **Background**

Corson County Deputy Sheriff Justin Tvedt (Deputy Tvedt), on December 19, 2017,

received a phone call from Westphal's ex-wife Nicole Forgey (Forgey), who reported that she

thought Westphal was using methamphetamine and marijuana. Gov't Ex. 1; Doc. 47 at 13. Forgey

and Westphal had children together, but were separated with Westphal dating a woman from

Mobridge named Skyler. Gov't Ex. 1; Doc. 47 at 13–14. The children reportedly told Forgey that,

while in Westphal's care, they had seen jars with a green substance and drug paraphernalia in the

house. Gov't Ex. 1. Forgey told Deputy Tvedt that she believed Westphal was paranoid because

he installed cameras around the house and slept with a pistol out of fear of law enforcement

1

watching him. Gov't Ex. 1; Doc. 47 at 13–14. Deputy Tvedt relayed this information from Forgey to Corson County Deputy Sheriff Michael Varilek (Deputy Varilek) that same day. Gov't Ex. 1; Doc. 47 at 12–13.

On the morning of Wednesday, December 20, 2017, Deputy Varilek provided the information to Potter County Sheriff Curtis Hamburger (Sheriff Hamburger), adding that he believed Westphal's girlfriend Skyler was Skyler Sartorius, a known methamphetamine user. Gov't Ex. 1; Doc. 47 at 14, 16. Sheriff Hamburger was aware of the situation and already had heard Westphal may be using drugs. Gov't Ex. 1; Doc. 47 at 16. Westphal's sister, Amy Cooper (Cooper), was planning an intervention for Westphal about his suspected drug use. Gov't Ex. 1; Doc. 47 at 17, 65. Sheriff Hamburger later told Deputy Varilek that Cooper wanted Westphal arrested and was willing to come to the Sheriff's Office to further discuss her request. Gov't Ex. 1.

Shortly thereafter, Cooper arrived at the Sheriff's Office and met with Sheriff Hamburger and Deputy Varilek. Gov't Ex. 1; Doc. 47 at 17, 65. Cooper was visibly upset as she recounted the attempted intervention to Sheriff Hamburger and Deputy Varilek. Gov't Ex. 1; Doc. 47 at 19. She stated that earlier that day she traveled with family members to Gettysburg to Westphal's house. Gov't Ex. 1; Doc. 47 at 19. When Cooper arrived at Westphal's house, she noticed that he had lost a lot of weight since June and that his cheeks were sunken in. Gov't Ex. 1; Doc. 47 at 20. During the intervention, Westphal was argumentative, combative, behaving very oddly, and appeared to be hallucinating. Gov't Ex. 1; Doc. 47 at 19–20. Westphal told Cooper that someone was in the neighbor's shed watching him. Gov't Ex. 1; Doc. 47 at 19–20. Cooper looked in the neighbor's shed and did not see anyone in it. Gov't Ex. 1; Doc. 47 at 19–20. Cooper also saw Westphal take something from his bedroom and put it in the garage out of site. Gov't Ex. 1; Doc.

2.

47 at 21. Cooper told the officers that Westphal was monitoring his house using cameras which would send notifications to his four cell phones. Gov't Ex. 1; Doc. 47 at 20. Cooper disclosed that prior to the intervention, on September 22, 2017, Cooper received a picture from Forgey of a marijuana pipe and lighter found in Westphal's cabinet that their ten-year-old child took while at Westphal's house. Gov't Ex. 1; Doc. 47 at 20. Cooper showed the picture to Deputy Varilek. Doc. 47 at 21–22.

The above information was incorporated into an Affidavit in Support of Request for Search Warrant in which Deputy Varilek requested a state judge to issue a search warrant for Westphal's residence, garages, vehicles, and a blood or urine specimen. Gov. Ex. 1. That same day, a state judge signed the warrant and the officers executed it. Gov't Ex. 1; Doc. 47 at 20. When the officers arrived, they found Westphal in the garage, placed him in handcuffs, and escorted him to the patrol car. Doc. 47 at 46. The officers seized a wooden dugout which contained a pipe and a small amount of marijuana located on the garage floor, small plastic baggies found in an enclosed trailer, and cleaning rods, snort tubes, and paper with residue on it located in a safe. Gov't Ex. 1; Doc. 47 at 20. The officers also seized five cell phones, a laptop computer, and several firearms. Gov't Ex. 1; Doc. 47 at 20. Six of the firearms were found in a gun cabinet inside the residence, two were found inside a pickup parked in the unattached garage, and two were found in the attached garage. Gov't Ex. 1. Later that day, officers obtained a urine sample from Westphal that tested presumptively positive for methamphetamine. Gov't Ex. 1; Doc. 47 at 105.

The next day on December 21, 2017, Sheriff Hamburger submitted an Affidavit in Support of Request for Search Warrant requesting a search warrant for the contents of the five cell phones and laptop computer seized from Westphal's residence. Gov't Ex. 2. The judge issued a search warrant for the electronic devices. Gov't Ex. 2.

On December 22, 2017, Sheriff Hamburger along with other officers were examining the seized firearms. Doc. 47 at 100. One of the firearms had some loose parts and had a gap in the seams of the forearm vertical grip. Doc. 47 at 100–01. On further inspection of the firearms, officers discovered a small bundle wrapped up in white electrical tape in a Ruger AR. Doc. 47 at 100–01. The small bundle contained what the officers believe to be an 8-ball of methamphetamine. Doc. 47 at 108. The officers had seized the Ruger AR from a gun case inside a truck during execution of the first warrant. Doc. 47 at 99.

The United States indicted Westphal on one count of conspiracy to distribute a controlled substance, one count of possession with intent to distribute a controlled substance, two counts of possession of a firearm by a prohibited person, and three counts of possession of an unregistered firearm and destructive device. Doc. 1. Westphal moved to suppress from use at trial all evidence taken from his property, arguing that the search warrants were invalid because the supporting affidavits did not set out probable cause that the officers would find evidence of a crime in Westphal's home or on his electronic devices. Doc. 27. Judge Moreno held an evidentiary hearing on February 27, 2019, heard testimony from Deputy Varilek and Sheriff Hamburger, and received twelve exhibits into evidence. Docs. 44, 47. On March 13, 2019, Judge Moreno issued a Report and Recommendation recommending denial of Westphal's motion. Doc. 49. Westphal has now objected to that Report and Recommendation. Doc. 53.

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In conducting a de novo review, this Court may then "accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); see also United States v. Craft, 30 F.3d 1044, 1045 (8th Cir. 1994). Having conducted a de novo review, this Court adopts the Report and Recommendation as modified.

## II. Discussion

The warrant clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached judge; (2) contain a particular description of the place to be searched, and the persons or things to be seized; and (3) be based "upon probable cause, supported by Oath or affirmation." Dalia v. United States, 441 U.S. 238, 255 (1979); see also U.S. Const amend. IV. "Ordinarily, evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Cannon, 703 F.3d 407, 412 (8th Cir. 2013) (citations omitted) (cleaned up). The exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" United States v. Leon, 468 U.S. 897, 906 (1984) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).

### A. Good-Faith Exception to the Warrant Requirement

Westphal argues that the search and seizure violated his Fourth Amendment rights because the authorizing warrant was not supported by probable cause. Doc. 53 at 2. As a result of this allegedly unlawful search, Westphal argues that the exclusionary rule should apply to prohibit any evidence seized to be used against him at trial. Judge Moreno reasoned that "whether the search warrant comports with Fourth Amendment strictures is no easy task," a task that was unnecessary to undertake because even if the warrant was not supported by probable cause, the "good-faith" exception to the warrant requirement applies. This Court concludes that the good-faith exception

applies to all of the non-firearm evidence seized, but finds that the inevitable discovery doctrine applies to the firearms seized and the methamphetamine located inside one of the firearms.

In United States v. Leon, the Supreme Court articulated a good-faith exception to the exclusionary rule. Leon, 468 U.S. at 920–21. Under the exception, the exclusionary rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." United States v. Taylor, 119 F.3d 625, 629 (8th Cir. 1997) (citing Leon, 468 U.S. at 905, 922); see also United States v. Gipp, 147 F.3d 680, 688 (8th Cir. 1998) (applying the Leon good-faith exception to a tribal search warrant). The Supreme Court explained the rationale behind the good-faith exception in this manner:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

Leon, 468 U.S. at 921 (internal quotation and citation omitted).

Under Leon, the exclusionary rule does not apply when police perform a search in "objectively reasonable reliance" on a warrant later found to be invalid. 468 U.S. at 922; Massachusetts v. Sheppard, 468 U.S. 981, 987–91 (1984). The rationale for this "good-faith" exception is that excluding evidence in cases where the police have a reasonable good-faith belief that a warrant is valid would do little to deter police misconduct. Leon, 468 U.S. at 919–21. An officer's reliance is not objectively reasonable, and the good-faith exception is therefore inapplicable, in four circumstances: (1) when the warrant is based on knowingly or recklessly made falsehoods in the officer's affidavit; (2) when the issuing judge has "wholly abandoned his

judicial role;" (3) when the information provided to the judge includes so little indicia of probable cause that the officer's belief in its existence is "entirely unreasonable;" and (4) when a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Id. at 923.

Westphal objects to Judge Moreno's finding and recommendation that the search resulting in seizure of evidence found in Westphal's home and garages was constitutional under the good-faith exception to the warrant requirement. Westphal's main argument against the good-faith exception is that the affidavits which relied on hearsay statements were so lacking in probable cause that Deputy Varilek and Sheriff Hamburger's belief in its existence was unreasonable. Doc. 53 at 2–3. Judge Moreno properly rejected this argument. Probable cause to search "exists if the warrant application and affidavit describe circumstances showing 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Montes-Medina, 570 F.3d 1052, 1059 (8th Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 238–39 (1983)). Here, Judge Moreno considered the statements included in the affidavit that were in part hearsay statements, the source of the statements (Forgey and Cooper), Forgey and Cooper's relationship to the defendant, the detail of the statements, Cooper's face-to-face disclosures to officers, and the basis for the informants' knowledge. Judge Moreno concluded that including some hearsay statements into the search warrant affidavits and subsequently relying on the warrants did not make the officers' belief that the warrants were supported by probable cause entirely unreasonable to preclude application of the good-faith exception. This Court agrees.

The investigation here was sufficient to make the officers' reliance on the warrants objectively reasonable. Deputy Varilek drafted the affidavit for the first warrant for Westphal's residence, garages, vehicles, and for a blood or urine specimen, and Sheriff Hamburger drafted the

affidavit for the second warrant to examine the contents of the five cell phones and laptop computer seized from Westphal's residence. While Cooper had personal contact with Deputy Varilek and Sheriff Hamburger, and Forgey had personal contact with Deputy Tvedt, personal contact between an informant and the officer drafting the affidavit is not always necessary to establish probable cause. United States v. Fiorito, 640 F.3d 338, 346 (8th Cir. 2011) ("[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit."); United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (explaining that personal contact with an informant is "not invariably required"). It does not defeat the good-faith exception that Deputy Tvedt told Deputy Varilek what Forgey had said, and Deputy Varilek communicated the information to Sheriff Hamburger. See United States v. Farlee, 757 F.3d 810, 819 (8th Cir. 2014) (finding that the good-faith exception applied even though the officer applying for the search warrant based his affidavit on an investigation conducted by another officer). Additionally, it does not defeat the good-faith exception that Sheriff Hamburger incorporated information from other officers into his affidavit for the second warrant. See id.

Second, Deputy Varilek and Sheriff Hamburger did not simply rely on what another officer told them about Westphal; they corroborated what Forgey had said by interviewing Cooper. Forgey thought Westphal was using drugs; Cooper thought Westphal was using drugs and observed behavior from her brother consistent with someone under the influence of drugs. Forgey said her children saw jars with a green substance and drug paraphernalia in the house, and Cooper showed Deputy Varilek a picture, albeit sent from Forgey and taken by her child, of a marijuana pipe and lighter found in Westphal's cabinet. Both informants disclosed information that Westphal had become paranoid and installed cameras around the house. Additionally, Cooper said that she had actually seen what she believed to be Westphal hallucinating when he said someone was

watching him from the neighbor's shed, when in fact, Cooper confirmed nobody was in the shed.

Cooper told officers how Westphal's appearance and behavior had changed since she last saw him

that summer: Westphal lost a lot of weight, his cheeks were sunken, he was behaving very oddly,

and he appeared to be hallucinating. Cooper's first-hand observations are more compelling than

information based on hearsay. See United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994)

("[T]here is an inherent indicia of reliability in 'the richness and detail of a first hand observation.'"

(quoting United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990))); see also United States v.

Hallam, 407 F.3d 942, 946 (8th Cir. 2005) (holding that affidavit that failed to provide sufficient

facts establishing the reliability of the informant but included some "fairly specific" first-hand

observations by the informant was not so lacking in probable cause that the officer's reliance on

the warrant was "entirely unreasonable").

An informant's statements are "more likely to be reliable" when officers independently

corroborate the statements as Sheriff Hamburger did here for the second warrant. United States v.

Clay, 646 F.3d 1124, 1127 (8th Cir. 2011); see also United States v. Warford, 439 F.3d 836, 841

(8th Cir. 2006) ("Even where an informant does not have a track record of supplying reliable

evidence, the information may be considered reliable if it is corroborated by independent

evidence."). By the time Sheriff Hamburger submitted an affidavit for the second warrant, officers

had independently confirmed information from Cooper and Forgey during the execution of the

first search warrant that Westphal had drug paraphernalia in his garage, Westphal apparently had

ingested illegal drugs as his urine sample tested presumptively positive for methamphetamine,

Westphal had cameras around his house, and he had multiple cell phones. Based on this

information, a state judge issued a search warrant to examine the contents of Westphal's electronic

devices for evidence related to drug use. This Court agrees with Judge Moreno's factual findings

and legal conclusions that the <u>Leon</u> good-faith exception applies to the non-firearm evidence seized, but that a different exception applies to the firearms and the methamphetamine found inside one of the firearms, such that the evidence should not be suppressed.

**B.     Seizure of Firearms**

Judge Moreno determined that the firearms and the methamphetamine found inside one of the firearms should not be suppressed for various reasons. This Court agrees with Judge Moreno's conclusion, but for somewhat different reasons.

First, the seizure of the firearms is not justified under the good-faith exception to the warrant requirement. The seizure was not based on "objectively reasonable reliance" on the warrant itself. The warrant was for drugs and material associated with the use of any drugs. Gov't Ex. 1. A drug dog was taken through the property and did not alert to the firearm where the methamphetamine was stored. Doc. 47 at 60. The officers did not search the firearms for drugs during the execution of the search warrant and did not have a reason to believe that one of the guns served as a container for methamphetamine until two days after the firearms were seized when officers were examining the firearms. If the officers knew when they seized the firearms that one of the firearms served as a methamphetamine container, their seizure would have been on "objectively reasonable reliance" on a warrant. However, these are not the circumstances of this case. The good-faith exception to the warrant requirement does not apply to the seizure to the firearms.

Second, the firearms were not seized pursuant to the officer-safety exception to the warrant requirement. Similar to a <u>Terry</u> frisk, officers can temporarily seize firearms in plain-view "so long as 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'" <u>United State v. Lewis</u>, 864 F.3d 937, 946 (8th

Cir. 2017) (citing Terry v. Ohio, 392 U.S. 1, 27 (1968)). Here, however, the seizure of the firearms was not "temporarily" merely to see if the firearms were loaded. See id. at 945. The officers seized the firearms for more than just officer safety; they seized them, entered them into the "Corson County Sheriff's Office Evidence Inventory & Receipt," did not give the firearms back after the search, and then discovered the methamphetamine hidden inside one of the firearms two days later. The officer safety exception does not apply in this case to the prolonged seizure of the firearms.

Judge Moreno found the plain-view exception to apply to justify seizure of the firearms. The plain-view doctrine permits seizure of the firearms even though the search warrant did not list them as items to be seized. The plain-view exception requires the Government to show "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." Lewis, 864 F.3d at 943 (quoting United States v. Vinson, 805 F.3d 1150, 1152 (8th Cir. 2015)). "[A]n item's incriminatory nature is immediately apparent if the officer at that moment had 'probable cause to associate the property with criminal activity.'" Id. at 944 (quoting United States v. Craddock, 841 F.3d 756, 759 (8th Cir. 2016)). Officers "may not manipulate the item in order to ascertain the incriminating character where it is not immediately apparent to him." Craddock, 841 F.3d at 759.

Westphal argues that the plain-view exception does not apply because the incriminating nature of the firearms, including the methamphetamine concealed inside one gun, was not immediately apparent. This Court agrees with Judge Moreno's determination that the first and third elements of the plain-view exception are met. The officers executing the search warrant

arrived and were present upon Westphal's property lawfully and had a lawful right to access property including guns connected with Westphal's drug use.

As for the second element, Judge Moreno considered whether the ten firearms' incriminating nature would be immediately apparent. Judge Moreno considered the information from Forgey and Cooper and concluded that reasonable officer would believe that Westphal was under the influence of drugs while in possession of a loaded firearm. Judge Moreno relied on South Dakota Codified Law (SDCL) § 22-14-7(3) (any person who has in his personal possession a loaded firearm while intoxicated is guilty of a Class 1 misdemeanor) and SDCL § 22-1-2(21) (defining "intoxication") to support that the object's incriminating nature would be immediately apparent. Westphal objects to Judge Moreno's conclusion, arguing that there was no testimony at the suppression hearing that the guns were loaded or that Westphal was under the influence at the time the warrant was served. Doc. 52 at 3. Indeed, the officers testified at the suppression hearing that they did not observe any signs that Westphal was currently under the influence of drugs when they arrested him, the firearms were not on his person, and there was no testimony that the firearms were loaded. The officers had information from Forgey and Cooper of Westphal's drug use, paranoia, and sleeping with a pistol, and found material confirming Westphal's possible drug use in marijuana, small plastic baggies in a trailer, and snort tubes. However, the amount of marijuana was small, not raising a suspicion of Westphal distributing drugs and leaving open the question whether it was "immediately apparent" to the officers that the firearms in the garages and gun cabinet were of an incriminating nature. See United States v. Kruse, 603 F. App'x 512, 517 (8th Cir. 2015) (per curiam) (holding that "the firearm's incriminating nature would have been immediately apparent given the officers' knowledge of [the defendant]'s prior drug convictions"); United States v. Nichols, 344 F.3d 793, 799 (8th Cir. 2003) (per curiam) (holding that the officers

12

were justified in seizing firearms not listed in the warrant because the plain-view exception applied because the officers knew the defendant's possession of the firearms was illegal based on his criminal record and the firearms "were in close proximity to the plethora of drugs and drug-related equipment"); United States v. Hughes, 940 F.2d 1125, 1127 (8th Cir. 1991) (holding that "[t]he fact that the gun was found in a house containing a distributable amount of cocaine and in a room containing cash proceeds from cocaine sales provided sufficient evidence to establish the gun was used in drug crimes"). The suppression hearing did not include evidence that the officers were aware of Westphal's prior criminal record that allegedly made him ineligible to possess firearms.[1] See Lewis, 864 F.3d at 944 (holding that the plain-view exception did not apply when the "admission [from the defendant that he was a felon] came *after* the seizure—not 'at that moment' it was seized"). Rather, the officers testified at the suppression hearing that they seized the firearms because Westphal's residence was located in a school zone. The facts before this Court present a close call on whether the second part of the plain-view exception test is met.

This Court ultimately need not reach a conclusion on the plain-view exception because the firearms seizure and methamphetamine discovery are admissible under the inevitable discovery doctrine.[2] Under the inevitable discovery doctrine, "if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the

---

[1] The indictment in this case filed August 14, 2018, alleges that Westphal was previously convicted of a crime punishable by imprisonment for a term exceeding one year, making it illegal for him to possess a firearm. Doc. 1. However, the record is devoid of evidence that the officers knew about his criminal history at the time of the search, so his ineligibility to possess firearms may not be used to justify seizure of the firearms under the plain-view exception.

[2] Again, the officers would have had probable cause to seize the guns or apply for a search warrant to seize the guns once they found out that the Westphal was ineligible to possess firearms. However, it is unclear if Westphal's ineligibility ever came to these officers' attention.

exclusionary rule does not apply." United States v. James, 353 F.3d 606, 616–17 (8th Cir. 2003) (citing Nix v. Williams, 467 U.S. 431, 444 (1984)). The Government argues that after a urine sample from Westphal tested presumptively positive for methamphetamine, the officers "had probable cause to seek a second warrant to go back to the house that night and seize the firearms." Doc. 48 at 4. Evidence that Westphal used methamphetamine after his possession of the firearms is probable cause to believe that Westphal was an "unlawful user of a controlled substance" at the time he possessed the firearm. See generally United States v. Boslau, 632 F.3d 422, 429–31 (8th Cir. 2011) (discussing the definition of "unlawful user of a controlled substance" in relation to federal firearms offenses). Officers would have then applied for another search warrant that night or the next day together with the warrant to search electronic devices, seized the firearms, and subsequently discovered the methamphetamine hidden within one gun. Therefore, the firearms and methamphetamine are not subject to suppression because they would have inevitably been discovered and seized.

## III. Conclusion

Having reviewed the record de novo, this Court agrees with Judge Moreno's factual findings and legal conclusions as modified concerning the search and seizure. Other objections Westphal now makes to these conclusions were fully addressed by Judge Moreno and do not require any further analysis. For the reasons stated in the Report and Recommendation as modified herein, this Court concludes that the evidence seized from defendant's person, residence, garages, vehicle, and trailer is admissible. Westphal's objections are overruled to the extent explained herein.

For the foregoing reasons, it is hereby

ORDERED that Defendant's Objections to the Report and Recommendation, Doc. 53, are overruled to the extent explained herein. It is further

ORDERED that the Report and Recommendation for Disposition of Motion to Suppress, Doc. 49, is adopted as modified by this opinion. It is further

ORDERED that Defendant's Motion to Suppress, Doc. 27, is denied.

DATED this 24th day of April, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE